IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATHAN DIXON,                                        CV. 08-3075 MO

            Plaintiff,                          OPINION AND ORDER

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.


MOSMAN, Judge:

## **INTRODUCTION**

Plaintiff Nathan Dixon ("Dixon"), brings this action pursuant to the Social Security Act,

42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social

Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits

("DIB"), a period of disability, and Supplement Security Income ("SSI") disability benefits under

Titles II and XVI of the Social Security Act.  For the reasons set forth below, the decision of the Commissioner is affirmed and this matter is dismissed.

## PROCEDURAL BACKGROUND

In January 1999, Dixon filed an application for disability insurance benefits under Title II of the Act alleging disability since March 13, 1998.  His  application was denied initially and upon reconsideration.  On January 9, 2001, a hearing was held before Administrative Law Judge ("ALJ") Stewart.   In a decision dated May 25, 2001, the ALJ found Dixon not disabled.  Dixon appealed to this court, and on January 14, 2003, the matter was remanded for further hearing.

On May 16, 2001, Dixon filed an application for SSI benefits under Title XVI of the Act, alleging disability since March 13, 1998.  Both the SSI and disability insurance claims were considered at a hearing on June 10, 2004.  On July 30, 2004, ALJ Stewart found Dixon was disabled as of January 27, 2004.  Dixon was therefore found to be disabled under Title XVI, and not disabled as to his Title II claim, as the onset of disability occurred after his insured status expired on December 31, 2002.

On November 24, 2004, the Appeals Council affirmed the ALJ's decision concerning the period beginning on January 27, 2004, but remanded the case for hearing regarding the period prior to January 27, 2004.  On March 17, 2005, ALJ Kingery held a third hearing.  In a decision dated October 24, 2005, the ALJ found Dixon not disabled prior to January 27, 2004.   On January 31, 2006, the Appeals Council remanded for further consideration of the evidence.

On May 16, 2007, ALJ Kingery held a fourth hearing.  On August 15, 2007, ALJ Kingery held a supplemental video hearing.  On November 29, 2007, the ALJ found Dixon not disabled prior to January 27, 2004. Dixon's request for review was denied, making the ALJ's decision the

final decision of the Commissioner.  Dixon now seeks judicial review of the Commissioner's decision.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert. denied*, 517 US 1122 (1996).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews*, 53 F3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986).  The Commissioner's decision must be upheld, however,  if  "the evidence is susceptible to more than one rational interpretation."  *Andrews*, 53 F3d at 1039-40.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

3  - OPINION AND ORDER

Step One.  The Commissioner determines whether claimant is engaged in substantial gainful activity.  If so, claimant is not disabled.  If claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate claimant's case under step two.  20 CFR §§ 404.1520(b), 416.920(b).

Step Two.  The Commissioner determines whether claimant has one or more severe impairments.  If not, claimant is not disabled.  If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three.  20 CFR §§ 404.1520(c), 416.920(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, claimant is disabled.  If claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of claimant's case proceeds under step four.  20 CFR §§ 404.1520(d), 416.920(d).

Step Four.  The Commissioner determines whether claimant is able to perform work he or she has done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step five.  20 CFR §§ 404.1520(e), 416.920(e).

Step Five.  The Commissioner determines whether claimant is able to do any other work. If not, claimant is disabled.  If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do.  The Commissioner may satisfy this burden through the testimony of a

vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part

404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs

exist in the national economy that claimant can do, claimant is not disabled.  If the Commissioner

does not meet this burden, claimant is disabled.  20 CFR §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at

1098.  At step five, the burden shifts to the Commissioner to show jobs exist in the national

economy that the claimant can perform.  *Id*.

## ALJ's DECISION

At step one, the ALJ found Dixon had not engaged in substantial gainful activity after the

alleged disability onset.  This finding is not in dispute.

At step two, the ALJ found Dixon had the medically determinable severe impairments of

a depressive disorder, NOS, personality disorder, NOS, substance abuse, degenerative disc

disease, mild with symptom exaggeration and inconsistency on testing, and an intermittent skin

condition. This finding is in dispute.

At step three, the ALJ found that Dixon's impairments did not meet or medically equal a

listed impairment.  This finding is not in dispute.

The ALJ determined that Dixon retained the residual functional capacity to perform light

work, lift 20 pounds occasionally and 10 pounds frequently, and sit, stand or walk for six hours

in an eight-hour day, with the ability to change positions every 30 to 60 minutes.  He can only

occasionally bend, twist, kneel, or stoop, should have no close interaction with the public or with

co-workers, and he is precluded from complex or detailed instructions or tasks.  This finding is in

dispute.

At step four, the ALJ determined that Dixon was unable to perform his past relevant work in construction. This finding is not in dispute.

At step five, the ALJ found that Dixon was capable of performing other work that exists in the economy, including newspaper carrier, small products assembler, and hardware assembler. The ALJ concluded that Dixon was not under a disability as defined in the Act prior to January 27, 2004. This finding is in dispute.

## FACTUAL BACKGROUND

Dixon was born in 1949, and was 49 years old at the time of the alleged onset of disability. He completed two years of college courses in business administration. Tr. 71, 28, 93.[1] Dixon has past relevant work as a construction foreman, maintenance worker, stock clerk, shipping and receiving clerk, and a machine packager. Tr. 125-31.

The medical records in this case accurately set out Dixon's medical history as it relates to his claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Dixon contends that the ALJ erred by: (1) improperly failing to credit the opinion of Francis Gilbert, Ph.D.; (2) finding him not credible; (3) improperly discounting Harold Nelson's testimony; (4) failing to give appropriate weight to the Veterans' Administration decision

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

6  - OPINION AND ORDER

regarding his service connected disability; and (5) relying on an inadequate hypothetical question

to the Vocational Expert ("VE").

I.  The ALJ Properly Weighed the Opinion of Dr. Gilbert

      Francis S. Gilbert, Ph.D., examined Dixon on February 13, 1998.  Tr. 171-78.  He

diagnosed cocaine dependence, dementia, pathological gambling in full remission, nicotine

dependence, and a personality disorder with passive-aggressive, narcissistic, antisocial, and

dependent features.  Tr. 177.  Dr. Gilbert rated Dixon's global assessment of functioning

("GAF")[2] score as 50.

      In January 2003 this court found that the ALJ had failed to articulate specific and

legitimate reasons to discount Dr. Gilbert's opinion, and credited the opinion as a matter of law.

Tr. 519.  The court found that "the improperly discredited opinion does not necessarily establish

that plaintiff is precluded from employment.  While Dr. Gilbert's opinion suggests some

limitation due to plaintiff's mental health, it is unclear to this court whether these limitations

would diminish plaintiff's ability to perform work."  Tr. 521.  This matter was remanded to the

Commissioner to clarify the record regarding plaintiff's mental health issues.  *Id*

      The most recent ALJ decision incorporates by reference the October 2005 ALJ decision.

Tr. 438.  In that decision, the ALJ stated:

---

    [2]  2 The GAF scale is a tool for "reporting the clinician's judgment of the individual's
overall level of functioning."  American Psychiatric Ass'n., Diagnostic and Statistical Manual of
Mental Disorders 32 (4th ed. 2000)).  It is essentially a scale of zero to 100 in which the clinician
considers "psychological, social, and occupational functioning on a hypothetical continuum of
mental health-illness," not including impairments in functioning due to physical or environmental
limitations.  *Id* at 34.  A Global Assessment of Functioning ("GAF") score between 41 and 50
indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent
shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no
friends, unable to keep a job)."  *Id* at 32.

Special attention has been paid to the opinion and findings from Francis Gilbert, Ph.D....as requested by the district court remand. The claimant's scores on the Employment Readiness Scale were, according to this clinical psychologist, consistent with '...some type of problem interfering directly with work functioning.' [Citation omitted.]

'Individuals in this score range may have a negative attitude toward work, or may perceive that they are unable to return to competitive employment. There may, in addition, be substantial emotional and behavioral problems which interfere with their ability to function within a cooperative work setting. Structured work placement is definitely suggested prior to a return to competitive employment.' [Citation omitted.]

These statements from Dr. Gilbert, however, are not persuasive as to the actual status of the claimant's mental functioning. Although Dr. Gilbert notes the possibility of substantial emotional and behavioral problems, he does not actually conclude that these problems exist or what they are. He also does not state any limitation but rather that a return to work should be proceeded by a structured work place. This suggests an ability to work but that some extra supervision would be helpful to counter the claimant's negative attitude toward work or possible behavior problems. There is no indication that this sheltered setting would last 12 months. Other portions of the doctor's report reveal that he suspects an alcohol history as well as drug dependence even tough [sic] Mr. Dixon denied these problems. The record, however, shows that the claimant had, in fact, relapsed into the alcohol abuse early 1998 confirming Dr. Gilbert's suspicion. When Dr. Dragovich testified that absent substance abuse the claimant would not have a personality disorder the doctor's findings would appear to reflect the substance abuse. The limitations on close interactions with co-workers or with the general public are adequate to address the substance induced personality disorder limitations.

Dr. Gilbert also stated that individuals with the claimant's scores might simply have a negative attitude toward work or perceive themselves as incapable of competitive employment. A negative attitude toward work does not make an individual 'disabled'. And any personal 'perception' that he is unable to work does not mean that the claimant is actually disabled. Again, the evidence does not support such a conclusion in the claimant's situation.

> Furthermore, the testing by Dr. Gilbert is based on the particularly
> troublesome problems facing the claimant at the particular time in
> February 1998. In addition to his relapse and as noted by Dr. Gilbert,
> the claimant was destitute and in debt to the State of California for
> $5000.00 in back child support. At the same time, he had '...unre-
> solved feelings about a long-standing relationship' [citation omitted].
> It appears that this was the relationship that, when it ended, sent the
> claimant into treatment for depression. Thus, Dr. Gilbert's conclusion
> is merely a one time 'snapshot' of the effects of some particular prob-
> lems, rather than a longitudinal analysis of any mental problems. The
> Administrative Law Judge has not given great weight to Dr. Gilbert's
> report.

Tr. 1123.

Plaintiff contends that the ALJ failed to credit Dr. Gilbert's opinion. The argument fails.
The ALJ appropriately credited as true all of Dr. Gilbert's findings, and adequately accounted for
any limitations in the residual functional capacity analysis by precluding "complex or detailed
instructions or tasks" and providing for "no close interaction with the public or with co-workers."
Tr. 437. By limiting the need to maintain attention and concentration consistent with complex
tasks, the ALJ adequately accounted for any cognitive limitations. By limiting his personal
interactions, the ALJ adequately accounted for any personality traits.

## II. The ALJ Appropriately Assessed Plaintiff's Credibility

The ALJ found "that the claimant's medically determinable impairments could not
reasonably be expected to produce much of his alleged symptomatology, and that his statements
concerning the intensity, persistence and limiting effects of these symptoms are not usually
credible." Tr. 438.

Plaintiff argues that the ALJ "pre-judged" his credibility because she found him not fully
credible in her October 2005 decision without allowing him or his character witnesses to testify.

Tr. 1129.  However, any error was cured when plaintiff was allowed to testify and call witnesses at the May 2007 hearing. Tr. 1266-1320.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F3d 715, 722 (9th Cir 1998).  Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.*  The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.  *Id.*  The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F3d at 724.  *See also Holohan v. Massinari,* 246 F3d 1195, 1208 (9th Cir 2001).  General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722.  *See also Holohan,* 246 F3d at 1208.  The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F3d 947, 958 (9th Cir 2002).

The ALJ noted the results of an MMPI-II personality test administered by John Louks, Ph.D., in June 2003:

/ / /

/ / /

/ / /

/ / /

/ / /

In addition to indications of emotional despondency and pre-occupation with medical illness, there was a suggestion of difficulties with authority, moral judgment, impulse control and manipulativeness. Dr. Louks specified that 'the profile suggests that he is adopting the role of the invalid. While objective physical ailments may be present, there is the possibility that he is exaggerating them to some degree.' Dr. Louks also diagnosed personality traits not conducive to reliability, including narcissistic, paranoid, dependent, and anti-social traits [citation omitted].

Tr. 438.

The ALJ noted that Dixon had attempted to establish credibility through his testimony and the submission of additional exhibits. The ALJ pointed to multiple statements Dixon made to care providers and in his sworn testimony that his skin condition began in Viet Nam, following exposure to Agent Orange. Tr. 1365, 780, 1163. However, the medical records indicate that he was treated for the condition in 1969, two years before he went to Viet Nam, following exposure to jet fuel. Tr. 669-71.

The ALJ noted medical records from 1971 in which Captain August D'Alessandro recorded that Dixon said he had developed an "eight to 10 bag a day habit" of heroin in Vietnam, and would relapse if he were to return. Dixon testified that he had never used heroin, and could not remember the examination by Captain D'Alessandro. Tr. 1135, 835, 1288.

In her most recent decision, and her earlier decision incorporated by reference, the ALJ cited multiple records in which care providers questioned whether Dixon exaggerated his symptoms and the objective medical evidence failed to support his reported symptoms. Tr. 440-41, 1124-12. In April 1998, one month after his alleged onset date, Robert Naymick, M.D., examined Dixon after "he tried to run yesterday and 'pulled up' after about 50 yards with left leg

11  - OPINION AND ORDER

pain and numbness." Tr. 223.  Dr. Naymick observed that he ambulated easily and mounted the

exam table fluidly.  Plaintiff was tender in the sacroiliac area, but otherwise performed normally

on examination.  Straight leg raises were negative and he was able to walk on his heels with good

strength and balance.  *Id*  Dixon demonstrated weakness with dorsiflexion of the left foot.  Dr.

Naymick concluded that Dixon was precluded from performing heavy work, but was feigning

left foot weakness and using his injury for secondary gain.  *Id*

The ALJ noted the January 2001 evaluation of Mark Greenburg, M.D., in which Dixon

complained of back pain and shooting pain down the left leg.  Tr. 684-5.  Dr. Greenburg wrote

that during "the exam there is a significant amount of inappropriate pain behavior," and that

Dixon reported a lack of sensation in response to pin-prick testing despite active withdrawal from

the sharpness.  Dr. Greenburg noted that Dixon complained of pain in the testicles with passive

leg raising, and concluded that although "his history is of a herniated disc with a lower extremity

radiculopathy, the objective findings do not bear this out."  Tr. 685.

The ALJ summarized the July 2001 examination report of Steven Foutz, M.D.  Tr. 780-

85. Dixon reported that he slept poorly, napped two to three hours a day, could walk 50 yards, sit

for 20 minutes, did no domestic chores, and had constant pain of eight on a scale of one to ten.

Dr. Foutz noted that "considerable inconsistencies exist, such as failure of rotation of the neck

back to midline....He has muscle development to his back and thickening of the skin which is

remarkably inconsistent with an entirely sedentary lifestyle.  It may be of some significance that

he has legal action pending, as this statistically tends to delay recovery."  Tr. 785.

The ALJ cited the November 2001 interview by Brad S. Kauder, Psy. D.  Tr. 804-09.

Dixon reported that he shopped for groceries but could not prepare meals.  Dr. Kauder noted this

was inconsistent with his assertions in other records, and that Dixon ambulated with a free and natural gait.  He assessed his GAF at 70.  *Id*

The ALJ cited a physical examination in May 2002, in which Dixon was described as having fair mobility, complaining of pain in the back with movement, with symmetrical muscles, fair range of motion, and only slightly diminished strength.  Tr. 919.

The ALJ summarized a February 2003 emergency room examination for increasing back pain by Alan Jones, M.D.  Tr. 974-76.  Dr. Jones wrote:

> When I walk in the room he is lying on his side moaning with pain.  However, he was able to sit up and converse during the exam without any distress.  At the end of the exam he is lying on his side propping his head up with his elbow so that his torso is flexed to one side and not having any distress from that maneuver....Hallux dorsi-flexion and plantar flexion are claimed by the patient to be impossible and he has giving way weakness when he attempts these maneuvers.  However, he is able to walk on his heels and I can see him contracting the muscles of his toes at that point.... The patient described no relief from his pain but when I walked in the room he was asleep...and I had to wake him up to talk to him further.  His inconsistent exam and inconsistent pain behavior leads to the question of narcotic drug-seeking.

Tr. 974-75.

In March 2003, the ALJ found, Nurse Hatsui noted that Dixon ambulated without difficulty, and "does not have problems flexing and extending his spine.  It is difficult to assess Nathan bcs he presents conflicting information."  Tr. 1002.  Hatsui noted that Dixon had been noncompliant with ordered interventions, and that it "continues to be difficult to know what to do for him because it appears his primary goal is to increase [h]is SC pension."  *Id*

13  - OPINION AND ORDER

The ALJ articulated clear and convincing reasons to find the plaintiff less than fully credible as to his symptoms and pain.  The ALJ's credibility determination is supported by substantial evidence.

III.  <u>The ALJ Properly Weighed the Lay Testimony</u>

Lay testimony is "competent evidence that an ALJ must take into account" unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel,* 236 F3d 503, 511 (9th Cir 2001).  The ALJ need not cite to the specific record as long as "arguable germane reasons" for dismissing the testimony are noted, even thought the ALJ does "not clearly link his determination to those reasons" and substantial evidence supports the ALJ's decision. *Id.*  at 512.

Harold Nelson met Dixon in March 1997 in the VA residential drug treatment program.  He testified in June 2004 that Dixon walked slowly and his right foot swung out.  Tr. 1392. He testified in May 2007 that he had retired after working as an employment specialist for six years, and was currently a pastor at a church.  Mr. Nelson testified that after his injury, Dixon had been "trying to figure out what...he could do,"  and had turned down a job raking leaves because of his back. Tr. 1304. Mr. Nelson testified that Dixon had not turned down other jobs offered to him by the VA.

Counsel does not point to any specific testimony from Mr. Nelson that should be credited.  As the ALJ noted, Mr. Nelson testified in June 2004 that Dixon had anger management issues and depression.  Tr. 1395-97.  The ALJ accurately concluded that Mr. Nelson's testimony did not clarify Dixon's functional capacity.  Moreover, even if fully credited, Mr. Nelson's testimony

does not establish any physical limitation that is not adequately addressed by limiting Dixon to a reduced range of light work.

IV.  The ALJ Properly Considered the Rating Decision of the Department of Veterans Affairs

On September 19, 2003, the VA issued a Rating Decision denying benefits for a personality disorder and continuing a rating for chronic recurring urticaria/allergic dermatitis at 30% disabling.  Tr. 589-92.  The VA increased the disability rating for degenerative disk disease with lumbar and sacral radiculopathy and spinal stenosis from 20% to 60% disabling effective January 15, 2003.  Tr. 590-91.  The VA granted a total service connected disability for individual unemployability of 70%.  Tr. 592.  In June 2004, the VA retroactively changed the effective date of Dixon's disability to March 13, 1998.  Tr. 1220.

The ALJ must give "great weight" to a VA disability determination.  *McCartey v. Massanari,* 298 F3d 1072, 1076 (9th Cir 2002).  The ALJ may give less weight to a VA disability rating if she offers "persuasive, specific, valid reasons for doing so" that are supported by the record.  *Id*

The ALJ noted that the VA disability determination is not binding on the Commissioner, that it did not bolster Dixon's credibility, and that it did not contribute to establishing Dixon's functional status for the purpose of a Social Security disability claim.  Tr. 438.  The ALJ noted that the VA disability ratings are based on percentages, and her decision was not inconsistent with the VA's finding of a percentage of partial impairment.  Tr. 1129.  The ALJ cited the fact that the VA determination does not include Vocational Expert testimony, and that Social Security standards relate directly to 'employability' in the context of the existence of jobs in the national

economy.  Finally, the ALJ asserted that the VA rating did not appear to include an assessment of credibility, but rather was based substantially upon the claimant's subjective reports of symptoms which she has found not fully credible.  *Id*

The VA ratings decision cited the claimant's report that he was unable to stand for longer than one minute and that he cannot sit comfortably.  The claimant reported that he had to frequently change positions when sleeping.  The VA relied on Dixon's demonstration that he walked with a limp, displayed no range of motion in the lumbar spine with no curvature, and claimed excruciating pain beyond 20-30 degrees on straight let raises.  Tr. 591.

The VA rating was based in substantial part on Dixon's subjective reports of pain and symptoms.  The ALJ gave persuasive, specific, valid reasons to give the VA disability rating less than great weight.

V.  The ALJ Properly Relied Upon the Vocational Expert's Testimony

Dixon contends that the ALJ erred in relying upon the vocational expert's testimony.  The VE testified on direct that her information about job requirements conformed with the Dictionary of Occupational Titles ("DOT").  However, on cross-examination, the VE clarified that her information about the newspaper delivery job was modified to include delivery by automobile. The DOT limits the position to deliveries by bicycle or walking.

The ALJ must determine whether a VE's testimony deviates from the DOT, and whether there is a reasonable explanation for the deviation.  *Massachi v. Astrue,* 486 F3d 1149, 1153 (9th Cir 2007).  The VE testified that she relied upon her professional expertise and experience to describe a variation in how this job is performed by automobile.  Tr. 1252-53.

16  - OPINION AND ORDER

Any error was harmless. The ALJ identified two other jobs Dixon could perform. Tr. 446. The ALJ's step five determination is supported by substantial evidence.

## **CONCLUSION**

For these reasons, the ALJ's decision that Young is not entitled to disability insurance benefits or supplemental security income under Titles II and XVI of the Social Security Act prior to January 27, 2004, is based on correct legal standards and supported by substantial evidence. The decision of the Commissioner is affirmed and this case is dismissed.

IT IS SO ORDERED.

Dated this __15th__ day of September, 2009.


/s/ Michael W. Mosman_____
MICHAEL MOSMAN
United States District Judge